Filed 11/7/13  P. v. Blake CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HAROLD WAYNE BLAKE, JR.,<br><br>    Defendant and Appellant. | F064892<br><br>(Super. Ct. No. BF137863A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Louis P. Etcheverry, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Harold Wayne Blake, Jr., (defendant) stands convicted, following a jury trial, of willfully inflicting corporal injury on his spouse, during which he personally inflicted great bodily injury.[1] (Pen. Code,[2] §§ 273.5, subd. (a), 12022.7, subd. (e).) Following a bifurcated court trial, he was found to have suffered a prior conviction under the "Three Strikes" law. (§§ 667, subds. (c)-(j), 1170.12, subds. (a)-(e).) His motion for a new trial was denied, but his request to dismiss the prior strike conviction was granted. He was sentenced to a total of seven years in prison, and ordered to pay restitution and various fees, fines, and assessments. On appeal, he raises claims of prosecutorial misconduct. We affirm.

## FACTS

## I

### PROSECUTION EVIDENCE

Pamela Blake (Blake) and defendant were married in September 2005. During the course of the marriage, Blake became the sole provider. Blake grew stressed because, while she was working long hours, defendant was gone most of the time and not bringing home money. In 2008, Blake became frustrated enough that she wanted a divorce, and the couple separated for a period of time. Although Blake moved back in with defendant in 2010, the relationship was not good. Toward the beginning of 2011, while Blake was at work, defendant spent time on a daily basis with a woman named Susie. Blake expressed concern about the relationship, but defendant did not stop seeing Susie.

In July 2011, Blake and defendant resided in the 1700 block of Lake Street, Bakersfield, with their roommate, Christopher Stone.[3] Things were "pretty bad" in the

---

[1] The abstract of judgment reflects defendant was convicted by plea. We will order correction of this clerical error.

[2] All statutory references are to the Penal Code unless otherwise stated.

[3] Further undesignated dates in the statement of facts are to the year 2011.

2.

marriage, and Blake expressed her desire for a divorce.  Defendant was not "very accepting" of the idea.

On July 30, Blake picked up her Jeep from an auto body shop.  The alignment seemed off, so she had it checked and discovered the front rotors were so worn, the vehicle was unsafe to drive.  Because of comments defendant made about a month earlier, Blake thought defendant might have switched the rotors on her Jeep with those on Susie's vehicle.  When Blake arrived home, around 5:00 p.m., she found defendant lying on the bed, watching television.  She asked if he had given the rotors from her Jeep to Susie.  Defendant quickly got off the bed, grabbed his tennis shoes, and went to where Blake was standing at the bedroom door.  Blake moved to the right a little because defendant was exiting.  Defendant head-butted Blake with a lot of force.  She fell against the wall.  Defendant put his arm around the lower part of Blake's neck, shut the door, and dragged her to the middle of the bedroom, choking her.  She felt pressure around her neck and had trouble breathing.  She did not recall defendant saying anything, but did hear the dogs barking.  Defendant released his hold on Blake, "flung" her into the closet door, and then "came at [her] a second time."  She asked him to stop.  He put her in a second choke hold.  This time, his arm was right up under her chin.  He grabbed his wrist with his other hand so that Blake's head was in his elbow area, and he continued to choke her.  She struggled, scratched, and hit him, but she still could not breathe.  She went down on her knees, and he continued to choke her.  She started "seeing white lights" and urinating.  She then passed out.

Blake did not know how long she was unconscious, but she woke to find the left side of her face on the floor and to see defendant letting the dogs out.  Blake crawled over the bed.  She was gasping for air, and her heart and chest hurt.  When she told defendant she could not breathe and that her chest and heart hurt, he told her to sit on the edge of the bed in front of the air conditioner, and she would be fine.  He refused to let her leave

3.

the bedroom. She asked for the water bottle that was on her nightstand; defendant uncapped it and poured the water on top of her head and said, "there you go, bitch."

Defendant started unscrewing the bedpost, asking her, "do I need to worry about you calling the police? Do I need to worry about you filing a report?" She kept telling him no. She tried to screw the bedpost back on because she was afraid he was going to use it on her. She was in pain and trying to breathe. He tried to talk to her while she sat there, but she did not recall what he said.

Blake left the bedroom about 8:00 that night. She and defendant went to the drive-through window at Taco Bell to get dinner. Blake was unable to eat her food. She could not swallow anything other than her beverage. When they got home, they sat on the porch for a while. Blake went to bed about 10:30 p.m.

About 1:30 to 2:00 the next morning, July 31, Blake awoke to find defendant in the bed next to her, stroking her, saying he was sorry and did not mean to do it, and inviting her to cuddle. She told him not to touch her because she hurt. He lay there and eventually fell asleep. She then got up and started quietly gathering her belongings.[4] She planned to put everything in her vehicle and leave. She needed to shower, however, because she was still in the clothes she had been wearing when defendant choked her. When she went into the bathroom and looked in the mirror, she saw that both of her eyes were full of blood. Blake showered and dressed.

At 6:30 a.m., when defendant rose, Blake was on the front porch, drinking coffee, and getting ready to leave. Defendant asked where she was going. She told him she needed to go to work. Although she occasionally went shopping for her job on Sunday afternoons, defendant questioned her going to work on a Sunday morning. She asked him if he thought she wanted anybody to see her like that, and what was she supposed to

---

[4] Blake saw Stone asleep on the bed in the spare room. She did not know if he was there during the incident, however.

4.

tell people about her eyes. He said, "oh, my God, I'm so sorry. [¶] … [¶] … I can't believe I did that." Blake told defendant she was going to buy a pair of dark sunglasses and do her shopping, and she would be right back.

Blake shopped and then delivered the groceries to the intermediate care facility where she worked. She then went to her brother's house. Her head, eyes, neck, and whole body hurt. Due to her brother and sister-in-law's concern for her, Blake went to Memorial Hospital. She spoke to the police there, and they took photographs.

While Blake was with her brother, her cell phone rang a few times. She hung up each time. Blake's brother eventually answered the call. Defendant was on the phone, and Blake's brother yelled at him. Defendant said, "I did what I did, I will take my butt kicking like a man. You want me to come to your house or you want to come over here[?]"[5]

On August 2, Blake went to Highgrove Medical Center, to see her primary care physician. Blake was referred to an ophthalmologist, Dr. Alexandrakis, whom she saw on August 8. Because her eyes were "full of blood" and she worked with the public, she requested time off work until some of the blood dissipated. It took approximately three weeks for her eyes to clear up completely. She returned to work on August 29.

In October, Blake made an appointment to see Dr. Wong, an ophthalmologist with whom she was acquainted, because her right eye was still bothering her. Blake's physical problems persisted as of her January 2012 trial testimony.

---

[5] Blake's brother told the prosecutor and her investigator that defendant said, "I deserve everything I get, you can come over here or I can come over there if you want. You can't hurt me any more than I'm already hurt."

Wong, a physician specializing in ophthalmology, examined Blake on November 23.  He observed some retinal damage that could have been the result of long-term retinal bleeding.  There were two small areas of retinal bleeding in the right eye.[6]

Wong explained that conjunctival hemorrhage refers to bleeding in the outermost coat of the eyeball.  That area of the eye is extremely vascularized, and breakage in any of the blood vessels results in conjunctival hemorrhage.  When such damage occurs, it is "quite obvious," as the white part of the eye appears filled with blood.  In his practice, Wong saw a lot of conjunctival hemorrhaging in the older population, age 65 and above.  In such individuals, the condition is usually unilateral (in only one eye) and results from uncontrolled blood pressure, blood thinning medication, or possibly some trauma.  In the younger population, the condition is usually due to injury, particularly a blunt trauma intrathoracic injury that raises the pressure inside the chest.  Bilateral conjunctival hemorrhage is more consistent with trauma, such as a black eye, a punch in the chest, a car accident, or a strangulation type of injury.  The same mechanism that causes conjunctival hemorrhage causes retinal hemorrhage; however, the retina is a tissue in the back of the eye.  If the injury were due to strangulation, the amount of pressure needed to cause conjunctival hemorrhage possibly would be less than that needed to cause retinal hemorrhage.

Wong explained that petechia is an initial step in a conjunctival hemorrhage.  It means some of the capillaries are broken, but not the bigger blood vessels.  Tiny dots of hemorrhage will be scattered around the conjunctiva.  The white of the eye will still be visible, whereas with massive conjunctival hemorrhage, only blood can be seen.  Petechiae indicate less pressure than hemorrhage.

---

[6]     Wong acknowledged that the ophthalmologist who examined Blake in August 2011, shortly after the incident, observed conjunctival hemorrhage but not retinal hemorrhage.

Wong reviewed photographs of Blake taken on July 31, 2011.  The extensive bilateral conjunctival hemorrhage was most suggestive of, and consistent with, trauma, either "intrathoracic strangle" or getting punched extensively in both eyes at the same time.  In strangulation, the blood circulation in the head and neck has diminished return, which builds up pressure and breaks the blood vessels.  This mechanism is the same for both conjunctival and retinal circulation.

Kern County Sheriff's Detective Wood specialized in domestic violence and had training and experience in investigating crimes involving strangulation.  She explained that strangulation is a form of asphyxia characterized by the closure of blood vessels and/or air passageways, and is caused by external pressure to the outside of the neck.[7]  The most common type of strangulation seen in domestic violence investigations is manual strangulation.  She explained that persons who are strangled may, while being strangled, urinate, defecate, vomit, or pass out.  They may also see what they call stars or black or white.  Strangulation can result in bruising to the neck, laryngeal trauma, eye trauma, headaches, and subsequent difficulty with swallowing and speaking.  Petechiae, which are produced when capillaries burst due to external pressure on the neck, may form in the eyes.  There may also be conjunctival hemorrhaging; this turns the white of the eye red.  In Wood's training and experience, hemorrhaging indicates a more severe strangulation than the mere presence of petechiae.  Petechiae can also be caused by sky diving, strenuous labor during childbirth, "horrible" fits of coughing, and scuba diving.

## II

### DEFENSE EVIDENCE

Kern County Sheriff's Deputy Gonzalez interviewed Blake at the hospital at approximately 7:30 p.m.  He noted her left eye was bloodshot, and blood was pooled

---

[7]     Strangulation differs from choking in that choking is internal and caused by an object.

under both eyes. She also had a bruise on one arm. Following defendant's arrest that evening, Gonzalez documented injuries to defendant's left ear and scratches to his face.

Defendant testified that he and Stone spent July 30 leveling the backyard and laying sod. The day was very hot, and they stopped working around 4:00 p.m. Stone went inside to shower while defendant swept the driveway. Defendant then grabbed a couple bottles of water and headed into the bedroom, where he prepared to take a shower.

Blake arrived home about 5:00 p.m. Defendant had just finished his shower and was dressing in the bedroom, when he heard her come in the front door. She was angry and screaming for him. Defendant slipped on his shoes and headed for the door, at the same time receiving a text message from Stone, stating he was scared and asking if he should leave. Defendant told him not to go anywhere. As defendant opened the bedroom door, Blake was coming in. She said something, then put her hands together and hit defendant in the solar plexus.[8] She accused him of taking the rotors off her Jeep and putting them on his friend's car. As he buckled, he told her he did not do that, whereupon she grabbed his ear and started slapping him with her fingers hooked to scratch or claw him. She injured his ear. When he tried to block her blows, she again struck him, lower this time.[9]

Blake's aggression caused defendant to back all the way across the bedroom. When he could go no farther, he slammed her back against the closet door with his left arm. He then pinned her hands to the door. He never spun her around or grabbed her in a carotid hold, nor did he fling her over by the closet door. Instead, as he had her hands pinned above her head, he asked her what was wrong with her. She tried to push her way off the door, but then he felt her relax and he walked away. When he reached about the middle of the foot of the bed, Blake lowered her head and rushed him. He put one hand

---

[8]     Blake had what defendant considered extensive training in law enforcement.

[9]     Blake denied being the aggressor.

to the upper part of her body, above her breasts, and tossed her on the bed. He did not hit her in the neck area or head-butt her. Because the bed rattled when she landed on it, he started tightening the bedpost while he again asked her what was wrong with her. She said she could not breathe or swallow. She was lying on the bed at the time. He said, "come here, baby," then pulled her up, took her to the other side of the bed, poured water on both their heads, and turned on the ceiling fan to cool her down. She said she needed a drink, so he opened a second bottle of water and handed it to her. She drank half of it, then said she still could not breathe. He helped her to the other side of the bed, sat her down, turned on the air conditioning unit, and asked her if that was any better. She saw that his ear was bleeding, and grabbed a tissue and started tending to his scratches. Blake never lost consciousness.

Defendant asked her what she meant about the rotors. He explained to her that the rotors from a Jeep would not fit on the kind of car driven by his friend, Susie. During this discussion, defendant and Blake worked their way to the front porch, having only remained in the bedroom from about 5:00 p.m. to 5:20 or 5:30 p.m. They sat on the porch, talking mainly about the Jeep, for about an hour and a half. Blake went inside, got her stuff, and came out. They then went to get something to eat. Blake drove, picked the restaurant, and ordered the food. When they got home, they both ate. Blake only ate a portion of her food, but she typically "eats like a bird" and likes to share her food with the dogs. Blake then went inside to lie down. Defendant finished texting his son, then followed her inside. It was about 10:00 or 10:30 p.m. They slept together that night. Blake did not go to sleep with urine on her panties; she was "a neat freak" and would never have done so. Defendant never caused her to urinate on herself.

The next morning, defendant woke at approximately 6:30. Blake was already up. She told him to look at her eye. There was a single bright red spot in the corner next to the bridge of her nose. Defendant apologized, but Blake started getting snappy and said she would see him out on the porch. Although she never directly accused him of causing

9.

the injury to her eye, he asked if she was going to call the police. She said she was not. He asked because of the hostile way she was acting. Defendant did not physically abuse Blake; he believed he may have inadvertently caused her eyes to bleed by holding her hands to the wall and restraining her while she was pushing back.

Blake and defendant drank coffee and smoked cigarettes out on the porch. Blake started "getting wound up" about having to go to work with her eye like that. Defendant did not know how to respond. She left at 8:00 a.m., and defendant went back to work on the yard. Around 10:00 a.m., Stone came outside, accused defendant of beating Blake up, and punched him in the gut and ribs. Defendant tried to text Blake to ask what was going on, but she did not respond. At some point, defendant called her phone, but her brother answered and "started going off," so defendant hung up. He remained at home, trying to get in contact with Blake, until after dark that night when the police arrived.

Blake had defendant served with divorce papers while he was in jail.

## DISCUSSION

Defendant contends the prosecutor engaged in a pattern of misconduct throughout trial, thereby violating defendant's federal constitutional right to due process and requiring reversal. The governing law is settled. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) A prosecutor need not have acted in bad faith for misconduct to have occurred. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the

impropriety. [Citation.]' [Citation.] [¶] The foregoing, however, is only the general rule. A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if '"an admonition would not have cured the harm caused by the misconduct."' [Citations.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (*People v. Hill, supra,* 17 Cal.4th at pp. 820-821; accord, *People v. Earp* (1999) 20 Cal.4th 826, 858.)[10]

"When a defendant makes a timely objection to prosecutorial argument, the reviewing court must determine first whether misconduct has occurred, keeping in mind that '"[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom"' [citation], and that the prosecutor 'may "vigorously argue his [or her] case" …, "[using] appropriate epithets warranted by the evidence."' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752-753.) "When a claim of misconduct is based on the prosecutor's comments before the jury, … '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) If misconduct occurred, but it did not result in a denial of due process, "we determine whether it is 'reasonably probable that a

---

**10** The California Supreme Court has also "stated an exception to the requirement that trial counsel must object to each instance of misconduct to preserve it on appeal when the 'misconduct [is] pervasive, defense counsel [has] repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile.' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Such circumstances did not exist in the present case.

11.

result more favorable to the defendant would have occurred' absent the misconduct. [Citation.]" (*People v. Welch, supra,* 20 Cal.4th at p. 753.)

## *Late Disclosure*

Defendant first contends the prosecutor committed misconduct by failing to provide discovery of the prosecution's medical expert witness (Wong), and the prosecution's strangulation expert witness (Wood), before trial. He further says the trial court erred by failing to instruct the jury with respect to the late disclosure.

1.       Background

Defendant was arraigned on the information on November 28, 2011, and both parties requested discovery pursuant to section 1054 et seq. The matter was assigned for trial on January 23, 2012. On the date set for trial, the prosecutor submitted a witness list that included Wood and Wong, as well as two other doctors.[11] Jury selection consumed the bulk of that day and the next.

In limine motions were heard beginning January 25, 2012. Defendant's first such motion requested that the prosecution immediately provide all notes and/or statements of witnesses not previously produced. The prosecutor represented she had provided everything as of that morning, although she acknowledged receiving additional information from Blake's brother the night before, which she immediately emailed to defense counsel. Defense counsel represented that he had only received Wong's resumé, curriculum vitae (CV), and reports that morning, and that he had not looked at any of them. Defendant's third in limine motion was to exclude opinion evidence as to the cause of Blake's eye injury or, in the alternative, to have an Evidence Code section 402 hearing on admissibility, with the objection being based on foundation and hearsay. Defendant also objected to Wood testifying, based on lack of notice, as defense counsel

---

[11]      Blake had been the only witness at the preliminary hearing.

had been provided with Wood's CV, but no statement from her. The court agreed to hold the requested Evidence Code section 402 hearings before ruling on admissibility.

Wood testified, outside the jury's presence, concerning her training and experience, particularly in the investigation of domestic violence cases involving strangulation; the types of strangulation she had encountered in her training and experience, and the physical symptoms experienced by individuals prior to losing consciousness; her review of Blake's statement and the reports in this case; and whether she saw signs or symptoms of strangulation to unconsciousness. Defense counsel cross-examined Wood extensively with regard to these areas, and concerning carotid holds. At the conclusion of Wood's testimony, defense counsel objected that he did not have a report from her, her CV was not provided until after the case was assigned for trial, and he could not now go out and get medical opinions that contradicted what she said. He argued that she was qualified to testify concerning the physical mechanics of strangulation, but not the medical aspects of the subject. The court ruled that Wood's testimony would be limited to specified areas. With respect to the claim of late disclosure, the court stated to defense counsel: "I thought I offered you earlier, when we first talked about a continuance, you indicated that your client did not want to waive time, and we wanted to go. If you need any continuance based on [Wood's] testimony right now, I can bring the jury back tomorrow morning, let you talk to all your eyewitnesses, and give you everything else you need." Defense counsel expressed his appreciation, but did not ask for additional time.

A second Evidence Code section 402 hearing was then held. Wong testified concerning his education and training; which of Blake's medical records he reviewed; and his examination and diagnosis of Blake. He also testified concerning possible causes of petechiae and conjunctival hemorrhage, and he discussed what he saw in photographs of Blake taken shortly after the incident. Again, defense counsel undertook a detailed cross-examination. At the conclusion of the hearing, defense counsel objected that "the

13.

People knew about this doctor back in November. At least the witness did." Counsel complained that he had not received any report from Wong, and only received his statement that morning. Counsel argued it was "very late discovery" and "highly prejudicial." The court ruled Wong could testify that certain evidence was consistent with trauma and strangulation, but not that the incident in July was a result of strangulation.

Wong was the prosecutor's first witness.[12] In his cross-examination of Wong in front of the jury, defense counsel brought out that Wong's reports were not transmitted until the day before Wong testified. Counsel also elicited that Blake saw Wong in November because she wanted a second opinion of a diagnosis, and that a doctor who had previously examined Blake did not observe the same damage to Blake's eye that Wong did. Defense counsel also elicited that things such as coughing or heavy lifting could cause the type of damage Wong observed, and that Blake and Wong had been acquainted for about two years. Counsel further elicited that Wong had received a letter of reproval from the medical board.

At the beginning of court the next morning, January 26, 2012, defense counsel complained that the defense had had no notice of the People's strangulation expert before Monday, January 23. Counsel acknowledged the court had granted an Evidence Code section 402 hearing and had offered to continue the matter to permit the defense to find its own expert, but, counsel represented, the defense declined to do that because defendant was in custody and wanted to get out. Defense counsel further complained that the People had been debating which medical experts to present, and they settled at the last minute on Wong, who had seen Blake back on November 23, 2011. Counsel asserted Blake was aware of the examination, and he argued the People had the responsibility to

---

[12]    Wong testified before the jury on Wednesday, January 25, 2012. Wood testified before the jury on Friday, January 27, 2012.

14.

become aware of it if they intended to use it. Yet, Wong did not even transmit his information to the People until two days earlier, and defense counsel did not get the information until a couple of hours or so before he had to cross-examine the doctor. Defense counsel asserted there was also late disclosure with respect to Blake's brother, and he complained that Blake had mentioned defendant's criminal history during her testimony.[13] Counsel stated: "It is a continuing pattern, your Honor, of late discovery, and exceeding the proper discovery issues, and crossing that line. *And it does border on prosecutorial misconduct. I won't make that motion at this time.* I just want to advise the court about my concerns because of this history and so that from now on hopefully we won't do that." (Italics added.)

With respect to Wong, the prosecutor responded that she had subpoenaed the other ophthalmologist who examined Blake, and that she provided discovery with respect to him "a long time ago." A problem then arose with that doctor becoming uncooperative because he found out service was not proper. Rather than force him to come in, the prosecutor spoke to Blake, who related she recently had been seen by Wong. The prosecutor represented that as soon as she found out about Wong, she provided discovery, and she turned over everything to defense counsel as soon as she received it. The prosecutor also represented she had Wong come early so defense counsel could talk to him, and she noted counsel obviously had time to conduct research because he found a disciplinary action against Wong.

During the jury instruction conference, defense counsel asked the court to give CALCRIM No. 306 (Untimely Disclosure of Evidence). The trial court found the

---

**13** We discuss Blake's testimony concerning defendant's criminal history, *post*. Because defendant does not now raise the issue of late disclosure concerning Blake's brother, we do not address it further. We also do not discuss, because it is not challenged, the trial court's denial of defendant's new trial motion, which raised issues of, inter alia, late disclosure and prosecutorial misconduct.

15.

instruction "very troublesome."  Relying primarily on the discussion regarding CALJIC No. 2.28 (CALCRIM No. 306's counterpart) in *People v. Saucedo* (2004) 121 Cal.App.4th 937, 942-943, the court expressed concern about the instruction's effect on both sides' right to a fair trial, and concluded:

> "On this case, I am not inclined to give [the instruction] because I think I would be asking for probably a reversal.…  It doesn't -- it says this is what happened.  It doesn't tell [jurors] how they are supposed to handle it.  And it seems to me we are leaving it up to the jury to try to decide what to do with the pre-trial procedure as against -- and distract them from their substantive issues that they have before them.

> "What I did do on this case also, [defense counsel], at every step of the way I offered you continuances.  And I understand you didn't want a continuance because you wanted to get done.  You didn't make a motion for mistrial.  I understand why, you indicated that.  And I offered you -- what I don't normally do, I offered you the 402 hearings on areas beyond just qualifications to assist you in defense.  And so I'm comfortable that I don't have to give this instruction.  I'm comfortable that you have been able to represent your client fairly and effectively.  And so that's my ruling."

2.      Analysis[14]

The only substantive discovery mandated by the federal Constitution is the disclosure of material exculpatory evidence under *Brady*.  (*People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1211.)  Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused … violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.)  This is so regardless of whether the suppression was intentional, negligent, or inadvertent.  (*In re Sodersten* (2007) 146 Cal.App.4th 1163,

---

[14]     We cannot tell, with any certainty, whether defendant is claiming the prosecutor violated her duty of disclosure under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), or merely under California's statutory discovery scheme (§ 1054 et seq.).  The two are independent.  (*People v. Jordan* (2003) 108 Cal.App.4th 349, 359.)  Out of an abundance of caution, we will address both.

1225.)  The duty to disclose such evidence is wholly independent of the prosecutor's obligation under section 1054 et seq. (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1244), exists even where there has been no request by the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107), encompasses both impeachment and exculpatory evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676), and extends to evidence known only to law enforcement investigators and not to the prosecutor (*Youngblood v. West Virginia* (2006) 547 U.S. 867, 869-870; *Kyles v. Whitley* (1995) 514 U.S. 419, 438).  "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'  [Citations.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042, quoting *Kyles v. Whitley*, *supra*, at p. 437.)[15]  While disclosure must be made at a time when it would be of value to the accused (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51), evidence presented at trial is not considered suppressed, regardless of whether it was previously disclosed during discovery (*People v. Morrison, supra,* 34 Cal.4th at p. 715).

Although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence — that is, to any suppression of so-called '*Brady* material' — … there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281, fn. omitted.)  Thus, to merit relief on due process grounds, "the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment.  Evidence would have been *favorable* if it would have

---

**15**     Because *Brady* serves "'to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery,'" however, the prosecutor has no constitutional duty to conduct a defendant's investigation for him or her.  (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)

17.

helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been *material* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite *reasonable probability* is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 907-908.) "A showing by the [defendant] of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.] [¶] It follows that harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24, with its standard of 'harmless beyond a reasonable doubt,' is not implicated." (*In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 7.)

In light of the testimony given by Wong and Wood at trial, we question whether there was any suppression for *Brady* purposes. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 281.) Their testimony was not favorable to defendant, and he fails to explain how earlier disclosure would have helped him. It is not enough to speculate that he might have been able to impeach the witnesses or obtain his own experts to dispute their assertions. Accordingly, defendant has failed to establish that any delay or purported misconduct concerning the prosecution's experts violated his right to due process. (See *People v. Osband* (1996) 13 Cal.4th 622, 665.)

We turn to the statutory scheme that governs discovery in criminal cases in California: section 1054 et seq. The purpose of this scheme "is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.]" (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201.)

If the information is in possession of the prosecutor, or if he or she knows it to be in possession of an investigating agency, the prosecutor must disclose to the defense the names and addresses of individuals the prosecutor intends to call as witnesses at trial (§ 1054.1, subd. (a)), as well as "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical … examinations .…" (*Id.*, subd. (f).) Absent circumstances not relevant here, disclosure must be made at least 30 days before trial or, if the information comes into possession of the prosecutor within 30 days of trial, immediately. (§ 1054.7.)

The record does not support defendant's claim of a discovery violation with respect to Wong. The prosecutor explained the situation, and there is nothing before us to refute her claim that she made disclosure to defense counsel as soon as she had something to disclose. That Blake obviously was aware she had been examined by Wong several months before trial does not mean the prosecutor was required to obtain that information from the *victim*. (See § 1054.1 [prosecutor shall disclose specified information *if in possession of prosecuting attorney* or known by him or her to be *in possession of investigating agencies*].) Since defendant has failed to establish a violation of section 1054.7 with respect to Wong (see *People v. Rutter* (2006) 143 Cal.App.4th 1349, 1354), it follows he has failed to establish prosecutorial misconduct in that regard.

The record is less clear with respect to Wood. Assuming the prosecutor violated the statutory scheme, however, it does not necessarily follow that she used "deceptive or reprehensible methods to attempt to persuade either the trial court or the jury," as required in order for us to find she committed misconduct. (*People v. Morales, supra,* 25 Cal.4th at p. 44.) "[D]efense counsel's failure to timely seek appropriate sanctions *for prosecutorial misconduct*, or a continuance on grounds of unfair surprise, is fatal to a direct claim of error on appeal. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 151.)

19.

Moreover, "'[i]t is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.' [Citation.] Defendant sought no continuance, and he made no showing that his defense would have been different had he been provided timely discovery of evidence of [Wood's testimony]." (*People v. McKinnon* (2011) 52 Cal.4th 610, 668-669.) Again, speculation that timely disclosure would have allowed him effectively to investigate Wood's expertise or conclusions, or subpoena his own expert to rebut her testimony, is insufficient to establish prejudice (see *People v. Verdugo, supra,* 50 Cal.4th at pp. 281-282), and begs the question why defendant did not accept the trial court's multiple offers of at least a short continuance (see *People v. Robbins* (1988) 45 Cal.3d 867, 884 [usual remedy for noncompliance with discovery order is continuance], superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13).[16]

In a related argument, defendant contends the trial court erred by refusing to instruct the jury with CALCRIM No. 306 as a remedy for the prosecutor's alleged discovery violations.[17] Even though CALCRIM No. 306 appears to have resolved some

---

[16] Citing *Simmons v. United States* (1968) 390 U.S. 377, defendant says "[a] criminal defendant cannot be forced to forfeit one constitutional right in order to assert another," and so he could not be required to relinquish his Sixth Amendment right to a speedy trial in exchange for his Fifth Amendment right to due process. We have found no due process violation. Moreover, defendant reads *Simmons* too broadly. That case addressed the tension created when a defendant who had what he believed to be a valid claim under the Fourth Amendment was forced to choose between testifying to establish "standing" for Fourth Amendment purposes and waiving his Fifth Amendment privilege against self-incrimination by having his testimony at the suppression hearing used against him at trial. (*Simmons*, *supra*, at p. 394.) The high court concluded: "*In these circumstances*, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." (*Ibid.*)

[17] This instruction would have told jurors: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law.

20.

of the problems that plagued CALJIC No. 2.28 (see *People v. Thomas* (2011) 51 Cal.4th 449, 483-484 & fn. 6; *People v. Riggs* (2008) 44 Cal.4th 248, 306-307; *People v. Lawson* (2005) 131 Cal.App.4th 1242, 1247-1249; *People v. Bell* (2004) 118 Cal.App.4th 249, 254-256), we conclude the trial court did not err by refusing to give CALCRIM No. 306.[18]

Upon a showing that a party has not complied with section 1054.1 and that the moving party has complied with informal discovery procedures (a point not in dispute here), "a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order.  Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).)  The court may prohibit the testimony of a witness "only if all other sanctions have been exhausted." (*Id.*, subd. (c).)

"We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard.  [Citation.]  In particular, 'a trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to the prosecution's violation of a discovery order.'  [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)  "[D]iscretion is abused whenever the court exceeds the bounds of

Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.  [¶]  An attorney for the (People/defense) failed to disclose: _____ *<describe evidence that was not disclosed>* [within the legal time period].  [¶]  In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure.  [¶]  [However, the fact that the defendant's attorney failed to disclose evidence [within the legal time period] is not evidence that the defendant committed a crime.]"

[18]     To the extent our analysis may differ from that of the trial court, "'"we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm."'  [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 473, fn. 25.)

reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Here, we find no record support for any suggestion that delayed disclosure — if there was any — was willful or done to obtain a tactical advantage. (See *People v. Jackson, supra,* 15 Cal.App.4th at p. 1203.) Defendant has failed to show the accommodations offered by the trial court — a short continuance and Evidence Code section 402 hearings — were inadequate, under the circumstances, to ensure he received a fair trial. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1161; *People v. Bowles* (2011) 198 Cal.App.4th 318, 326.) Indeed, following the Evidence Code section 402 hearings, defense counsel was able to obtain rulings limiting or excluding altogether testimony with which other experts might reasonably have been expected to disagree (for example, Wood's testimony concerning how much pressure would cause loss of consciousness during strangulation, and Wong's opinion concerning whether the injury to Blake's eye was caused by strangulation). Also, when the People's experts testified, defense counsel did not ask for time to prepare for cross-examination. (See *People v. Walton* (1996) 42 Cal.App.4th 1004, 1017, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) Under the circumstances, defendant has failed to establish the trial court abused its discretion by not imposing the requested instructional sanction.

### *Failure to Control Witness*

Defendant next contends the prosecutor committed misconduct by failing to control the conduct of her witness. He says this resulted in a violation of the trial court's in limine ruling.

1. Background

Defendant moved, in limine, to exclude any evidence of his prior convictions. The trial court granted the motion as to the prosecutor's case in chief and bifurcated the trial on the prior conviction enhancement allegations. The court further ordered both counsel to advise their witnesses of the court's rulings on the in limine motions.

22.

During direct examination, the prosecutor questioned Blake about the deterioration of Blake and defendant's marriage. This took place:

"Q. Were you still happy and in love at that time in your marriage?

"A. I won't say 'no, I'm not happy.' I was stressed, yes.

"Q. Why were you stressed?

"A. He was gone most of the time, out late at night, not bringing home money. *In 2008, he was arrested for anger, controlled substance --*

"[DEFENSE COUNSEL]: I'll object. Lack of foundation. Move to strike.

"THE COURT: Sustain that -- all the answer exception of the --

"BY [THE PROSECUTOR]:

"Q. Without --

"THE COURT: Just a second. With the exception of the arrested for 2008, that will be stricken after.

"BY [THE PROSECUTOR]:

"Q. Now, without exactly explaining why, but in 2008 is that when you started having troubles in your marriage?

"A. Yes. [¶] … [¶]

"Q. Eventually, did you ever get frustrated enough that you wanted to get a divorce?

"A. Yes.

"Q. About when was that?

"A. It was in December of 2009. I was offered a job in Arizona. I took that position. I thought my husband, at the time, was going to be willing to transfer, which he was. *When I called probation*, because I --

"[DEFENSE COUNSEL]: Objection. I'll ask to approach. [¶] … [¶]

23.

"THE COURT: All right. Let's have a sidebar.

"(Sidebar discussion held.)

"THE COURT: Okay. I will sustain and strike that last answer, and you may continue.

"BY [THE PROSECUTOR]:

"Q. For now, let's just switch to a different subject matter. [¶] Where did you live with the defendant?" (Italics added.)

The next morning, when defense counsel was placing on the record his complaints about late disclosure, he mentioned that the prosecutor was supposed to tell her witnesses about the in limine rulings, yet the first witness she called mentioned defendant's arrest for drugs, in violation of one of the trial court's rulings. As we previously described, defense counsel claimed the prosecutor's actions "border[ed] on prosecutorial misconduct." The prosecutor responded:

"As far as his motions in limine, I have done my best to speak with all of the witnesses that I needed to and made them aware of things as soon as I possibly can. You know with [Blake], I have made it known that at this point she needs to come up with a different way of describing the events that happened between her and her husband .… And so … I think she understands the seriousness. It is just that for a woman who's trying to explain why they are having problems in their marriage, you know, and this is not a comfortable situation for her to be in .… This is very uncomfortable and difficult for her. So I can't -- I don't know why she said what she did. But those are the reasons why they were having problems and I think that's just why they happened the way that it did."

2.    Analysis

We assume, for the sake of discussion, that defendant preserved this claim for appeal, despite the fact he did not assign the incident as prosecutorial misconduct at trial. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1405.) "It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.) This is so whether the prosecutor acts intentionally or not. (*People v. Friend*, *supra*, 47

24.

Cal.4th at p. 33.) Similarly, "'[a] prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement.' [Citation.]" (*People v. Leonard, supra,* 40 Cal.4th at p. 1406.)

The record on appeal does not show the prosecutor had reason to believe Blake might answer as she did, or what, if anything, the prosecutor said to Blake on the subject before Blake testified. Accordingly, there is no evidence the prosecutor violated her duty to guard against statements by Blake containing inadmissible evidence. (See *People v. Leonard, supra,* 40 Cal.4th at p. 1406.)

In any event, assuming the prosecutor violated either or both of the foregoing principles, "it cannot be said that the prosecutor's asking of [two questions] … constituted a pattern of conduct so egregious that it rendered the trial fundamentally unfair in denial of defendant's federal constitutional right to due process of law. [Citation.] Moreover, even assuming the prosecutor's action amounted to misconduct under state law, no prejudice appears." (*People v. Cox* (2003) 30 Cal.4th 916, 952, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The incident was an isolated one. The questions asked do not suggest the prosecutor engaged in a deliberate attempt to put inadmissible and prejudicial evidence before the jury. (Contrast *People v. Bell* (1989) 49 Cal.3d 502, 531-532.) The trial court promptly sustained the defense objections and struck the offending testimony. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1073; *People v. Whalen* (2013) 56 Cal.4th 1, 62.)

### *Equating Defense Function with Confusing Jury*

Defendant complains that, during her final summation, the prosecutor improperly equated the defense function with confusing the jury, while equating the prosecution's function with seeking the truth. It appears he also claims the prosecutor committed misconduct by making personal attacks on the integrity of defense counsel.

25.

1.      Background

At the outset of his argument to the jury, defense counsel stated:

> "Right now this is the last chance I will have to talk to you and give you my summation of the case. And there are a lot of things about this case that are troublesome to everybody that gets involved with it including the prosecution. You know, as you look at their case this is a situation that goes back to July of last year, that's eight months ago. Eight months ago. And what you saw here at trial, you know, they presented the poor witness, Ms. Blake, the brother. And what you will find with the brother is that he entered the picture from the e-mail here on January 24th at 6:09. So one of the things, these last minute type witnesses that came out of the woodwork. The doctor -- and when he took the stand up there and I asked him when did you send this [*sic*] medical records to the People. Was the day before, his office faxed it the day before. This case goes way back.

> "And then because the case is so shallow, so shallow and not a lot of substance, they go get an expert from law enforcement that's [*sic*] going to introduce you to strangulation. And it is because, you know, we hear things like the Boston strangler. And it is supposed to paint the facts of this case like he is this strangler. And then you heard many times saying it is not choking, it is strangulation. And so it is a tough case that came together here at the last minute.

> "But we don't really talk -- I didn't hear a lot of talk on their presentation about the actual facts of the case.…"

In response, the prosecutor observed the People were being accused of having a weak case and of grabbing at anything they could, and of not talking about the facts. She argued that she did indeed speak about those things the jury would use to analyze credibility of witnesses, with credibility being the ultimate issue in the case. She stated that the evidence fully supported the charges in the case. She continued:

> "So why in the world is the defense bringing out all of these other things and talking about throwing out late discovery, evidence that's popping up at the last minute .…

> "I spoke with you specifically about speculation. Things that aren't in evidence.… You cannot speculate.

26.

"Now it doesn't matter do you know when this started, do you know when exactly the case started. We know the date, but you don't know when the criminal case started, it is not in evidence. As far as when things popped up or if it is last or anything like that, that's not for you to decide, that is not your duty. And you cannot speculate as to whether that's bad or not.

"Why is he trying to get you to? *Because he wants to confuse you. He wants you to be confused about the issues.* He wants you to think that well, there's got to be something wrong with the case because he is saying things popped up at the last minute. That's not -- that's not part of the evidence. Doesn't matter. The evidence is the facts that happened that day. And what is presented. And the different things that you have in your hand. [¶] … [¶]

"Now, how about the -- so the late discovery, you cannot speculate as to any of it, whether it is or not. Medical records, when they are given. You know when this e-mail comes really is not at issue. *It is only there to confuse the issues* and to try and get you to be confused about what's really going on." (Italics added.)

The prosecutor then discussed the testimony of the officer who responded to the

hospital, and interviewed and took photographs of Blake. She stated:

"He wrote his report, he was consistent with it, that helped him remember things. But with every single investigation out of the how many reports he has done, even in just the last year, is he going to remember every detail. Obviously not. Because that's what we pointed out. That's all we were doing. *[Defense counsel] wants you to be lost and confused and misled* by the fact and act like either [Blake] told him the truth or she didn't, and one or the other is a lie. *That's misleading you. And that's what the defense is doing.*

"They know that the case is there. They know what the facts are. *They are just trying to get you confused* or to get caught up on something that doesn't really matter because if we can get them confused, if we can make them think that, you know, there's this issue about an officer, the issue about the -- I mean, there is a lot of things, you know, discovery.… *All of that is just to try and confuse you* and get you to think that let's speculate and that's reasonable doubt." (Italics added.)

The prosecutor further told the jury:

27.

"And I can't just come up during closing argument and say look, the urination, loss of body control, the hemorrhaging in the eyes, all of that stuff is consistent and helps prove and support she lost consciousness. I can't say that without a domestic violence expert or, sorry, a strangulation expert that tells us that. Because that is something that you need to learn through the evidence. It has to be based on the evidence. I didn't bring her in to boost my case. I brought her in so that we know this is strangulation, this is the definition. When you look, this is what the symptoms you look for, this is what can happen. It is just to assist with that. Otherwise I can't make those arguments to you. *It is not to mislead you*. But the fact that that accusation is made is to mislead you. He raised all of that smoke. *Clear up those muddy waters*.

"It is like, you know, when you throw spaghetti on the wall and hope what sticks. You can't have it every way they want it. It is one way. And the only way is the evidence does show what happened." (Italics added.)

2.   Analysis

Defendant did not object to any of the italicized remarks, about which he now complains. As a result, he has forfeited his claim they constituted misconduct. (*People v. Earp, supra,* 20 Cal.4th at pp. 858-859; *People v. Wash* (1993) 6 Cal.4th 215, 265.)

Defendant says an objection would have been futile, because (1) he objected to the late discovery and the trial court refused his request to instruct the jury thereon, and (2) the prosecutor's repeated arguments that the defense function was to confuse the jury constituted a pattern of misconduct that excused an objection to each individual instance of misconduct. We find no reason to excuse the lack of objection. The trial court's refusal to sanction the prosecutor for late disclosure does not mean it would have been unreceptive to an objection that the prosecutor was mounting an improper attack on defense counsel. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 680.)[19]  And, "[i]f

---

[19]    In his reply brief, defendant says that, "[h]aving refused to instruct the jury that the prosecutor violated her discovery obligations, it defies logic to conclude that the trial court would have sustained an objection to the prosecutor's arguments to the jury *that there was no discovery violation*." (Italics added.)  This is not the argument defendant made in his opening brief; there, he claimed the trial court's denial of his request for a jury instruction on late discovery rendered futile "any objection to the prosecutor's

28.

defendant were correct that the disputed portions of the prosecutor's argument were improper, a timely objection to the first instance of such misconduct might well have prompted a favorable ruling and prevented repetition of such improper argument." (*People v. Jones* (1997) 15 Cal.4th 119, 181, overruled on another ground in *People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1; see also *People v. Hughes* (2002) 27 Cal.4th 287, 372.)

In any event, we find no reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion. (See *People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 305.) "It is misconduct when a prosecutor in closing argument 'denigrat[es] counsel instead of the evidence. Personal attacks on opposing counsel are improper and irrelevant to the issues.' [Citation.]" (*People v. Welch*, *supra*, 20 Cal.4th at p. 753.) Thus, "[i]f there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established. [Citation.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302.) However, "[i]t is not misconduct for a prosecutor to argue that the defense is attempting to confuse the jury. [Citation.]" (*People v. Kennedy* (2005) 36 Cal.4th 595, 626-627, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; see, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1002 [claim of misconduct forfeited by failure to object, and no reasonable likelihood jury improperly influenced by prosecutor's statement that defense counsel's job was to "'put up smoke, red herrings,'"

---

improper argument *suggesting the defense argument on late discovery was a smoke screen ….*" (Italics added.) As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2; *People v. Jackson* (1981) 121 Cal.App.3d 862, 873.) Defendant has not attempted to show any reason here. Moreover, that the trial court declined to sanction the prosecutor does not mean it would have permitted her to argue, in the face of a defense objection, that no discovery violation existed.

while prosecutor's job was to "'straighten that out and show [jury] where the truth lies'"]; *People v. Medina* (1995) 11 Cal.4th 694, 759 [comment that "'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get [jurors] to buy something'" not misconduct]; *People v. Marquez* (1992) 1 Cal.4th 553, 575-576 [referring to "'heavy, heavy smokescreen that has been laid down [by the defense] to hide the truth'" proper argument against jury's acceptance of defense presented]; *People v. Bell, supra,* 49 Cal.3d at p. 538 [comments that it was defense counsel's job to "'throw sand in [jurors'] eyes'" and that defense counsel wanted to confuse jurors not misconduct to extent they could be understood as reminder to jury not to be distracted from relevant evidence and inferences that might logically be drawn therefrom].)

When we consider the prosecutor's complained-of remarks in context both of defense counsel's argument (see *People v. Parson* (2008) 44 Cal.4th 332, 364; *People v. Young* (2005) 34 Cal.4th 1149, 1189) and the prosecutor's comments as a whole (see *People v. Avila* (2009) 46 Cal.4th 680, 714), there is no reasonable likelihood jurors understood them to suggest the function of the defense was to confuse the jury while the function of the prosecution was to seek the truth. Rather, the context was such that jurors would have understood the prosecutor simply to be urging them not to be misled by the defense argument. (See *People v. Cummings, supra,* 4 Cal.4th at p. 1302; *People v. Breaux* (1991) 1 Cal.4th 281, 306.) In this regard, we will "'not lightly infer'" that the prosecutor intended her remarks "'to have their most damaging meaning, or that the jury would draw that meaning from the other, less damaging interpretations available.' [Citations.]" (*People v. Young, supra,* 34 Cal.4th at p. 1192.) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper. [Citation.]" (*People v. Cummings*, *supra*, at p. 1302, fn. 47.) Neither is an argument that "'[does] little more than urge the jury not to be influenced by [defense] counsel's

arguments, and to instead focus on the testimony and evidence in the case.' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 771.)

### *Prejudice*

Little, if any, cognizable misconduct occurred. To the extent any did, defendant's trial was neither rendered unfair thereby, nor is it reasonably probable he would have obtained a more favorable result in the absence thereof. This is so whether we consider any instances of misconduct individually or cumulatively, and even in light of the trial court's refusal to instruct on late disclosure. (See *People v. Hill, supra,* 17 Cal.4th at pp. 844-845.) Accordingly, defendant is not entitled to reversal. (See *People v. Tully* (2012) 54 Cal.4th 952, 1023.)

### DISPOSITION

The judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment that reflects defendant's conviction was by jury trial rather than by plea, and to forward a certified copy thereof to the appropriate authorities.

_____

DETJEN, J.

WE CONCUR:


_____

GOMES, Acting P.J.


_____

POOCHIGIAN, J.

31.